Judge Underwood
cle'iv're'l the opi ’ion of the court.
Judge Nicholas did not sit.
In December, 1823, Stephen Stewart published his last will, by which he gave to his wife, the plaintiff in error, one-third of his personal estate during her life or widowhood, and upon her death or marriage, the one-half of said third was to be subject to her disposal absolutely, and the other half was to go to his two daughters. He likewise devised to his wife during life, or widowhood, several tracts of land with the same provision upon her death or marriage, leaving half at tbe absolute disposal of the wife, and the other half to the daughters. The will gives fifty acres of land to Lucy Towns, Stephen D B. Towns, (alias-Stewart) the defendant in error, and Betsey iVl Farlami.
In 1826 the testator died. It appears from the record that lie lived for many vears with the woman called by the name of Lucy Towns, and that tbe defendant in error was the issue of their cohabitation. In the fall preceding the making of the will the testator left home with the plaintiff in error, and they were married by a justice of the peace of Butler county, according to the forms of law. Be,fore this event, but how long does not appear, he liad separated from Lucy Towns, arid in consequence thereof a quarrel took place between him and the defendant, who took sides with his mother. It is proven .that Lucy Towns said she never was marrird to Stephen Stewart. This circumstance connected with the provisions of the will, and the fact that he married the plaintiff leave but little doubt that the connection between the testator and Lucy Towns was illicit.
On the day before tbe testator’s death, the defendant visited him. He returned the next day and found the testator dead. Before the corpse was inferred the transaction took place which constitutes *184 the subject of the present suit. The plaintiff executed an instrument of writing purporting for the consideration of one dollar, to sell or convey to the defendant all her right, title, interest and claim to the estate of Stephen Stewart, deceased, which she then was or might thereafter he entitled to bv deed of gift, will, or in any manner whatever. On the same dav this instrument was executed, the defendant executed another binding himself for the consideration of one dollar, to deliver over to the plaintiff two beds and furniture that she brought with her when she ca e to live with Stephen Stewart, his father; also one large kettle, one small pot, and one stew pan, anil also her wearing apparrel; all of which articles, according to the stipulation of the writing, he was to deliver as soon as possible, giving time for an executor or administrator to act lawfully. -
The plaintiff filed her bill in substance alledging that the instrument executed bv her was signed and delivered without, anv sufficient consideration, at a time when she was ignorant of her rights under the will, when she was not unalified to transact business, through grief for the loss of her husband, and When she was under the influence of fear excited by the conduct and threats of the defendant, wherefore -she prays that the instrument may he cancelled.
The answer of the defendant admits nothing favorable to the pbdntiff. He infists that the contract was fair, and on «Ft not to be disturbed. The court dismissed the bill with costs.
The transactions presented by the witnesses are of rare occurrence. The idea of the wife and the son deliberatelv and calmlv bargaining over the dead Tbodv of the husband and father, before it has been committed to the grave, ami disposing of the estate left bv'.him, is incompatible with those feelings of our nature, generally, if not universally, excited by the presence of the corpse A stranger upon such an occasion would he regarded as destitute of common svmpafbv who would make the mansion of the unburied dear? the r>lace of traffic. How the nearest connexions and relations of the deceased can do it is unaccountable upon the ordinary principles and feelings which govern human conduct.
*185 During the existence of coverture the law denies to the wife the capacity to contract, except in a few cases of peculiar character. The death of the husband removes the legal disability. The sorrow which pervades the mind and heart of a wife in consequence of the death of her husband, for whom during the coverture she felt common respect and affection, does, in many cases, temporarily disqualify and unfit the mind for a deliberate survey of the new attitude in which she is placed, and the new rights and duties which devolve upon her. Without saying, that all contracts made with a widow between the death and burial of her husband, would be regarded by us as void, prima facie, in consequence of the general prevalence of grief during this period, and a correspondent disqualification t.o think of and attend to business, it may be safely affirmed, that all such contracts should he watched with a jealous eye, and whenever there exists the least circumstance of unfairness or circumvention, the chancellor should interfere and set them aside.
In this case it is proved, that the plaintiff evinced by her conduct a deep sense of her loss. She manifested her affection by kissing the corpse, and she wept. There is nothing in the record which will authorize us to pronounce these indications of heartfelt sorrow, the artifices of deceit.
According to the proof, the defendant and his mother were at the mansion-house before the testator was buried, setting up pretences of authority, to say •the least of it, in defiance of the rights of the lawful wife. He demanded the.keys of R. Lewis, the plaintiff’s brother, and said lie would go where he pleased, keys or no keys. The plaintiff, at the request of George Mvcrs, surrendered the keys to the defendant, who gave them to M’Lean and M’Kinny to keep, and to examine the drawees, &o. for papers and money, which was done. The defendant became angry. He held an open French dirk in his hand. The plaintiff and another lady endeavored to get it from him. He refused to give it up to them —expressed a willingness to surrender it to some of the ‘ boys” and said, he did not intend any harm; and if he wanted to hurt any one, he would *186 rather do it with his fist. The defendant, by a question asked a witness, attempts to shew that he did not design to alarm by holding his open dirk in Ms hand; and that he took it out in order to hold up the bolt of one of the locks that was out of repair. Admitting that he first produced the knife for that purpose, it is incredible to believe that the two women should have desired to get the knife from him, and that the plaintiff should have been alarmed at it, as the witness says she was if he had immediately, after fixing the holt., put up his knife. What, cause of quarrel or dispute there was between Lewis and the defendant, we are not told, nor does the record exhibit any thing at which he could in our opinion be justly offended By one witness it is proved that the plaintiff, when the defendant came, shut the doors in apparent alarm, and refused admittance We refrain from stating facts detailed bv witnesses whose, credibility has been assailed. The inference to be drawn kom the foregoing, we think, well justifies the opinion that the plaintiff was induced to enter into the contract mainly by the improper and violent conduct of the defendant, and .not from a deliberate conviction, even if she had been in a situation to .mature the subject,, that the contract was beneficial to her. •
According to the defendant’s own admission, he had fallen out with his father because he discarded his mother and married or lived with the plaintiff as his concubine; to state it as ihe defendant would have it considered. This of itself was well calculated to make the plaintiff look upon him with dis.trust If he hail been a legitimate son, -discarded as he seems to have been, he had no right after his Lather’s death, leaving such a will as he did., to enter upon the mansion-house premises and demand the keys. His object in the whole proceeding was manifest. It was to divest the plaintiff of her rights, or to prevent her from sacrificing the rights of others If this last be insisted on as the cause of his interference, it may he truly replied that the law did not constitute him the guardian of anv person’s rights in this case. It was bis improper conduct, it seems, which induced many to advise the plaintiff *187 fu take' what she brought and give up‘the rest. Such advirtí, under such circumstances, was well calculated to add to the weight of the plaintiff’s grief, and further to distract her mind.
Contract: mode with a widow immediately after death of her husband, while his body 1 iy an unbuvied corpse in her presence, and under circumstances of violence calculated to intimidate he, to its execution, and by which, for a small consideration, she relinquishes a considerable ]■ gacy to which sh w *s en i* tied by her husband’s will, derided to b unrea. sonable, md tti- rcforeoancelablo by tho chancellor.
@ri(tenden, for plaintiff; Brown, for defendant.
It does not appear that the plaintiff at the time she executed the writing conveying her interest in the e.-tate of her deceased husband, had any knowledge of the contents of the will She ailedges she had not. The defendant expressed his disbelief of tfie allegation, hut does not pretend that tiie will Was exhibited, or its contents made Known at the time the contract was made. We think it but a-just inference, from the fact of his getting possession of the keys, examining drawers, &o. that he discovered the will and learned its contents If so, he ought to have made it known to tfie plaintiff before contracting with her.
The consideration of the contract is trifling, if it can be regarded at all. It proposes to secure to the plaintiff (regarding one obligation as the consideration of the other) a verv in< onsiderable portion of the property devised to her, and for that little, she gives up the balance worth ten or twenty times as much, it is manifest that unless the estate is insolvent, or nearly so, the consideration received by the plaintiff amounts to nothing.
Upon the whole case, we are clearly of opinion, that the contract comes within that class which Powel, in his treatise denominates unreasonable, and is as fit a case for the interposition 01 the chancellor as the case of Herne vs. Meeres, reported in I. Vern. 465, and Brown’s Chan. Ca. 176 in note, and commented'upon by Powell on Contracts 153.
The decree of the circuit court is therefore reversed with costs, and the canse remanded with directions to enter a decree cancelling the contract between the parties.